It would be helpful to know at the outset whether we're having any divided arguments. I don't know who we are, I don't know who's arguing, or how, and how you're dividing your time up. Okay, watch your own time, please. I always see that person sitting there making faces if the first person is talking too much. Okay, thank you. And you are not dividing, are you? Correct. Good morning. May it please the Court, Matt Glacey on behalf of Appellants, the Oregon Natural Desert Association, and the Audubon Society of Portland. With me at council table is David Becker, and I'll try to reserve two minutes of my time for rebuttal. The two crucial errors committed by BLM and the Secretary in approving this industrial scale energy project atop Steens Mountain were first failing to obtain essential winter habitat information, and second failing to identify and evaluate the effects of the project on connectivity between neighboring populations of the greater sage-grouse. And here's the reason why these two errors were so critical. The Oregon Department of Fish and Wildlife said in its greater sage-grouse strategy that winter habitat and genetic connectivity are so essential, and indeed irreplaceable, that if either of those things is found in a given area, that automatically kicks the area up to Category 1. And that would have fundamentally changed the disclosures and the environmental analysis, and quite possibly, in our opinion, the Secretary's ultimate decision as to whether or not to approve this project. BLM's statement combines those two today. Was that clearly stated by you in the proceedings below, the genetic connectivity? Yes, Your Honor. If you're asking about the waiver question, whether we adequately raised the issue in the district court, the answer is yes. We raised the issue in our briefing and during argument, and as you saw at ER 11 and 12, the district court judge defined the issue of genetic connectivity, so he showed that he understood what we were arguing, and he specifically referenced Dr. Craig Miller's GIS analyses and maps where he went into some detail also explaining what this issue is. And that was raised before and prior to the district court during the administrative proceedings? During the NEPA process as well, Your Honor. Yes, in our reply brief. You have two quotes which don't say it to me, I mean, to be frank. I mean, the two quotes, if you want to go back over them, you can, but they didn't. I mean, honestly, I did not understand the argument until the reply brief, to begin with. I mean, then I understood it, but it hadn't been stated clearly even in our opening brief. And then when you put two quotations in from your comments to the agency, they seemed totally off point. If you're referring to the quotations during the NEPA process on this comment letter to the agency, the best sites I can provide to you are ER 489 and ER 499 to 500, and those are the two places where Onda specifically referenced the issue of connections between populations and talked about genetic connectivity. And then also, importantly, referenced the ODFW strategy and the fact that if a connectivity corridor is found, that bumps the area up to category one, which, as we explained in the briefing, would have fundamentally changed the environmental analysis, because that would have been a. . . I never said that, Geneva. Excuse me, Your Honor? I never said that to, I'm sorry, to the agency. At ER 489, Your Honor, Onda specifically referenced category one and category two, and that's the place where, as you know, ER 426 and 429, ODFW specifically describes in its strategy that not only connectivity corridors, but also winter habitat are among the special biological requirements for the bird that bump this, what's otherwise low density habitat, up to this most important category, which is irreplaceable. And that's why the project would have gone forward under a presumption of no authorization, which would have changed the disclosures and the analysis. And the failure to inform the public and the secretary about these issues is even more glaring when you consider that the Steens Act charges the Secretary of the Interior with protecting the long-term ecological integrity of this specially protected mountain and defines long-term ecological integrity as including, among other things, genetic interchange. So if you go back to the Organic Act itself that establishes the special area on Steens Mountain, the Secretary already had a pre-existing obligation to consider this issue. This is just like the case Onda v. BLM. If you recall that case, the Department of the Interior, this court held that the Department of the Interior had the authority to manage for wilderness values under the Federal Land Policy and Management Act, and because of that authority, under NEPA, the Secretary had an obligation to study whether those values were present in the planning area, and if so, what were the environmental consequences of the plan on those values. The same thing is true here. Based on the organic authority and the command to manage for genetic interchange on Steens Mountain, because the Secretary has that authority, in fact, that duty, then under NEPA, BLM was required to look and see if genetic connectivity existed in the project area, and if so, what were the environmental consequences of this project on connectivity. Onda raised the issue. BLM had a duty to look and see if connectivity was present, and the same is true of winter habitat. BLM had a duty to go out and look to see if winter habitat was actually present at the project site. So it seems to me that the case on the winter habitat issues, your biggest hurdle is the land council versus McNair case, which seems to, I mean, this is sort of similar to that in the sense that you're, but they were in a sense using a proxy, the proxy being the argument is, well, those areas for various reasons are not. I guess one of your arguments is that the areas are not actually sufficiently similar to a service of proxy. I gather there's also material in the record, which I don't think you pointed to, that there actually were birds up there during the winter. At the off-site areas that they did study, yes, that's correct, Your Honor. The agency studied, as you say, these off-site areas lower in elevation down the mountain that were not appropriate, not analogous to the actual project site, which literally is on the escarpment next to the drop-off, which drops the better part of a mile down to the Alvord Basin below. The wildlife consultant that did the studies did actually find birds in December at one of the two lower elevation sites. And as a matter of fact, at FSER 366, you'll note that the consultant also found birds in February. So they found birds in December, not in January. Again, they detected some in February, not in March. The birds are up there. And when you... They detected them at the other sites. At the off-site area, because they never visited the actual project site. So they don't know whether there are birds there or not. They chose to infer that there weren't. But the key thing here, I think, is that the weight of the scientific evidence in the record, literally 100% of the evidence in the monograph by the leading experts in the U.S. Fish and Wildlife Service's 12-month finding for the sage-grouse, in the Oregon Department of Fish and Wildlife Strategy, in Dr. Clay Brown's expert declaration, all of those leading sources say that windswept ridges, like the one we're dealing with here at the project site, are precisely the type of place where you'd expect to find these birds in the winter at these unique high-elevation sites like Steens Mountain. And, in fact, in the EIS, you'll note at EI 333, the statement does say that the windiest time of year at the Achanis project site is December through March. So exactly the time of year when the birds are going to be up there. And in the winter, the sage-grouse are a little bit nomadic. They will move around to try to find the best place to spend their winter over the course of these four or five months. So they'll move around depending on snow levels. They'll move to a windswept ridge where sagebrush is exposed. They're even known to bury themselves in the snow for thermal regulation and cover, in addition to needing that exposed sagebrush for food. Given that winter habitat is unique and distinct among the birds, seasonal habitats, and that the techniques used to identify it are readily known, this issue of winter habitat falls squarely into the regulation at 40 CFR 1502.22. That's the regulation that deals with missing or incomplete information. And this court, in the Save Our Ecosystems case in 1984, and then recently reiterated in the Native Village of Point Hope case in 2014, said that 1502.22 spells out or sets out the ordered process that an agency has to use when faced with missing or incomplete information. And the regulation says if the incomplete information is relevant to adverse impacts and it's essential to inform decision-making, the agency shall include the information in the EIS and the only exceptions, or if it's cost exorbitant, or if the techniques to get that information are unknown. Well, as we've pointed out in our briefs, the LM never claimed either of those exceptions apply here, and it's true on the record as well. ODFW pointed out that doing a helicopter ground-based survey would only take a couple hours. The agency pointed out that there actually are other techniques that one can use to find winter habitat if it truly is impossible to get to that place in the winter. Do you have any understanding of why this happened? I mean, why, how this gap developed in the record? I mean, why they didn't just do it, especially in the last four years? I mean, I gather we have agreement from both of you that we should go forward with the case because, you know, there is a sufficient probability that this project may go on, but in fact it's at this point mothballed, as somebody said. And so while it's been mothballed for I don't know how many years, somebody could have gotten to have those birds, and nobody's done it. Is there some reason? I think we can only speculate that the developer didn't want to spend the money to do additional surveys. There's a hint of that in the record where the wildlife consultant talks about being asked to do the job on the cheap with the type of resources that are not being given the type of resources that are typically provided to get the type of information needed to prepare a sufficiently informative EIS that's going to provide for meaningful public participation, but also informed decision-making by BLM, including in BLM's recommendation to the Secretary of the Interior as to whether to approve the project or not. Let me turn, yes? I will reserve the rest of my time. Thank you. May it please the Court, Your Honor. My name is Peter Krzywicki, and I represent the United States Bureau of Land Management and Sally Jewell. This case involves a transmission line that will connect the Itchianus Wind Energy Project to the grid. The project will be able to generate up to 463,000 megawatt-hours of renewable energy, and this energy will avoid 194,000 metric tons of carbon dioxide and other harmful pollutants each year. This court should affirm the district court because BLM fully complied with NEPA by taking a hard look at the potential environmental impacts of the project and by disclosing them to the public in an environmental impact statement. Can I ask you about the environmental impact statement at ER 348, explaining the extrapolation from the two other lower ridge sites, the East Ridge and the West Ridge? The statement is made, no greater sage grouse were found later in December or in January, February, March, or April during the time the snow had accumulated. And so that's the basis for the extrapolation to say that there wouldn't be any problem on the higher Itchianus project area. As counsel for the appellants here said, if you look at the document at SER 366, the consultant that was, as I understand it, relied on for the statements in the environmental impact statement, actually found four sage grouse in the East Ridge on February 28th. So there's a factual misstatement that appears in the EIS. And if that's true, doesn't that do your whole predicate? Because this is an extrapolation, and if you're representing and understanding that there are no sage grouse in February, and in fact there were, doesn't that shift the assumption of you're in favor of the agency? No, Your Honor. I don't believe that it does, and there are a few reasons for that. So first of all, and I believe that it is relatively clear that actually the point about sage grouse is they do, and I actually think that opposing counsel has made this point elsewhere, that they do move around to some extent, but ultimately find a specific spot, a specific winter habitat where they're going to stay for an extended period of time. And the issue is, although broadly phrased, winter habitat is often more specifically referred to as overwintering habitat. And so the one stray sighting, albeit. But that's not Judge Fletcher's point. His point is that the statement that's in the document is incorrect. It says no, I mean you could explain it now. You're standing up here explaining something, but the agency didn't explain it because they made a mistake. They said no greater sage grouse were found later in December or in January, February, March, or April, and that's not true. Your Honor, to be sure, there was a misstatement, and I can't, you know, I don't, I see it. I see where you're pointing to. You're not standing up and giving us explanations, but that's the agency's job, right? Yes, Your Honor. It is the agency's job to provide an explanation. However, I don't think that the one stray sighting changes the conclusion or the reasonable basis for it. And I don't understand because the whole predicate for this extrapolation in the face of an argument that says, well, you shouldn't be relying on the lower elevation comparatives because things are different up on the higher windswept ridge. And the response or the justification for this extrapolation is dependent upon a factual error. And so I don't know how you get around that. So, Your Honor, I. There's no explanation by the agency. It's a straight-up statement that there aren't any sage grouse in these areas. And the very record, the consultant that they're relying on says quite a different thing. Your Honor, you're taking, and this is, to be sure, to Judge Parazon's point, I can't change what the record says. And I recognize that there was an oversight that they should have acknowledged this one sighting on February 28th. However, I, my understanding is that it's not, it's a sighting that doesn't, it's not data that is sufficiently significant to be contrary to what the point of the EIS actually is, which is that effectively these birds do move to lower elevations and one sighting isn't enough. Now, have there been repeated sightings? That would suggest that there actually is overwintering habitat, and that would be contrary to what the EIS states. But there aren't repeated sightings. There is one stray sighting of four birds on February 28th. Well, now, wait a minute. I'm just, you know, I'm looking at the EIS and what precedes that. These surveys found greater sage-grouse on the sites, 36 on the east ridge on December 17th, and nine birds, down to nine, in a different ridge on December 11th. Okay, so it's taking snapshots. That's what the consultant did. And then it said, but there weren't any in February. And the consultant says, yes, there were. There were four. So how do we, you're saying the magic cutoff is nine? No, Your Honor. I'm not saying that there is a magic cutoff. I'm saying that there is a difference between an exceptional case and a regular reoccurrence. Because the way that when. The reason it seems that the burden, I knew, is unusually, or the agency is unusually strong is because, for whatever reasons. I mean, it's a mystery why they didn't just go count these birds where it mattered, as opposed to somewhere else. But they didn't. So, I mean, there may be other things wrong with the analogy. But, I mean, in other words, if you're trying to extrapolate, essentially not do the direct work, then it seems that the data from which you're extrapolating needs to be particularly solid, and it isn't. Your Honor, to be sure, I understand your point. And my only response is, is the exceptional case versus the regular and routine case that. But it's an exceptional case, which isn't even the case. I mean, in other words, you're trying to have the public, and you're representing that, and there was a sufficient hard look under NEPA to not do the actual counting in the actual place, but to do counting somewhere else. And I gather, and I gather there are two versions of that. One is, well, this is higher up, so there'll be more snow, so there'll be less grouse. And the other one is that it's higher up, but it's more windblown, so the snow's going to blow off, and they'll be happier up there than lower down. And we don't have an answer to that, right? Your Honor, to this, you've moved on to a different point, which is a point I completely. But it's different only in the sense that it says that the analogy isn't so strong to begin with. And now, if there's something wrong with the data from which we're extrapolating, that's sort of a further weakening of the analogy. There's no, so at least with respect to the fact that it might be windier higher up, there's no data to support that statement. The only thing that. Exactly. That's the problem. I mean, it is a funny, I guess I asked your colleague this, and what the whole record calls out to me is why didn't you go count those silly birds? I mean, instead of just doing this analogy for some reason. Because the experts at the Bureau of Land Management are confident that this is the right result and that this is the proper conclusion to draw. Your Honors, at this point, I'm out of time. I would. All right. Okay. I have one final point, which is that. Go ahead and make your final point. I'm sorry. In terms of the genetic connectivity argument that they make, they make a particular point in the reply brief, which I commend to this Court, is absolutely incorrect. BLM followed ODF&W's strategy document to the letter, and to the extent they suggest otherwise in their reply brief, they are improperly reading. Remember, it's in their reply brief and wasn't even clear from the beginning brief, and certainly didn't seem to be clear from anything they said to the agency. So, thank you very much. Thank you, Your Honor. Sorry if you're frustrated. Okay. Yes, sir. My name is Dominic Carollo. May it please the Court, here on behalf of Harding County. I'd like to take a different approach in answering the question about winter habitat. One thing I'd like to compare it to, for instance, I have the pleasure of working with a lot of local governments on issues involving species, so I want to provide an analogy, for instance. Say you're looking for a fish, a coho, a coho salmon. You wouldn't go look and survey for coho salmon or their nests or their reds in the stream when it's flooding, because you wouldn't be able to see the fish. Similarly here, what BLM recognizes is that when they're at these lower elevation sites, once the snow is on the ground and the sagebrush is covered, there's no birds to go find. I mean, it's sort of a practical reason why a survey wouldn't be done when you can look up at the mountain at 7,000 feet from below and see that it's covered in snow. Practical common sense would dictate that you're not going to find birds when they're dependent on having sagebrush that's exposed. And so I think that's what BLM was reasoning, and you see that in the emails that we provided in the briefs between them and ODFMW. I think what's untenable about the opponents' position is that I think what they said was that ODFMW and Fish and Wildlife Service are among the leading sources for trying to figure out what to do with some of these uncertain impacts of wind projects on sagebrush. And what we see, and this was pointed out in the government's brief, when this was done and after all the collaboration between the county and between Fish and Wildlife Service, between ODFMW and between BLM's biologists, they said a job well done and we want to use this as a national model for these types of projects. And this includes in looking at the data they had from the other project sites about determining whether or not this higher elevation site was occupied by sagegrass in the winter. They ran it by the exploration sites. What they wanted to say was we looked up on top of the mountain and there was, and every day from December 15th to March 15th and everything was covered with snow so there couldn't have been any birds. I guess they could have said that, but it's not what they said. Yeah, I think they did say that, actually. They didn't say we looked up on top of the mountain. They said it's higher up so there'll be more snow. Well, actually the agency specifically said that the mountain's generally covered with snow earlier and later than other sites. That was an affirmative statement of fact in the EIS. I think we all pointed it out in our briefs. And, you know, if an agency gives you... Well, this is a site on what you just read. Generally covers snow earlier and later. That's a site at... That's a site at... That's a site at ER 348. And so it says the project is generally covered with snow earlier and later in the season than the Eastridge and Westridge projects. So, you know, under the Lands Council case that you mentioned, Your Honor, I mean, this court recognized that when you're relying on experts in their field of expertise as the BLM and the Secretary relied on ODF&W and the Fish and Wildlife or the appellant's recognizer experts, they get deference for their scientific judgments. Surely the same reasoning must apply to basic findings of fact about climatology and about basic land conditions on the landscape. I mean, the BLM in Harney County controls 60% of the land in Harney County. I mean, they are the chief owner, chief manager of the land. If they don't have deference for making a basic finding about when the mountain's covered with snow or not, I don't know what they can get deference for. So I would suggest that their analysis is perfectly reasonable as far as the habitat impacts that would likely be associated. But moreover, under the city of Sausalito cases, the court has recognized that mitigation is a prime consideration in looking at overall the broad brush of what a reasonably thorough discussion of environmental impact says. And in fact, the cases say that... My understanding, you can tell me if I'm wrong, is that we have a particular problem here, which is the sage-grouse have to go somewhere in the winter. Absolutely. Normally they fly downhill where they can find exposed sage-grouse. And so mitigation, which, I mean, unless you can tell me why this mitigation, the mitigation being other acres that are going to be made more amenable to them, is going to cover this problem, i.e., the wintering problem. Well, that's what the expert agency said, Your Honor. I mean, that's what Fish and Wildlife and ODF have said. They've recognized... It's just talking in general about mitigation, but it doesn't talk about it with regard to the wintering problem. Well, yeah, because there's going to be effectiveness monitoring at the sites to continue to monitor for the birds. I mean, the monitoring doesn't end with EAS. Where are you going to monitor? Along the corridors and at the wind project site. That's part of the effectiveness monitoring for the project. And, again, they've waived all their arguments against the mitigation. I mean, I think the court has to assume that mitigation is going to do everything it's promised, because they argued that point to the district court, and they have not challenged any portion of the mitigation on appeal. Therefore, that issue is waived. And so I think under those circumstances, it's really not even proper for us to be here questioning the mitigation, because it has to be accepted. The question was mitigation directed at the specific question of where these birds could be in the winter. Providing a place for the birds. As the district court said, they assumed that those birds occupied that habitat during the spring, summer, fall, and early winter, and that they were going to take other downgraded habitat and upgrade it so that there would be a net benefit. And it would require by findings of the expertise. But you didn't answer my question. If you did, the answer was no, it doesn't deal with the winter. Well, no, it does, because if you're going to be upgrading habitat lower in elevation, that would provide more winter habitat. Say you had a juniper-filled patch of 10,000 acres, and it's at lower elevation, it's not covered by snow in the winter. You get rid of those junipers, and you get sage-grouse to encourage. You've just created 10,000 acres of wintery habitat that didn't formerly exist. That was the plan. And I want to mention that Harney County, who, as many know, has been subjected to the occupation over the last 45 days, I mean, they opened their land use process up to enforce that type of mitigation, precisely that mitigation on 10,000 acres of land, to make this project happen, to have some economic growth in a county that is the most economically depressed in the state. Looks like my time is up. Thank you. Thank you very much. Your Honor, on the issue of the adequacy of the winter surveys, a big part of the government's and the intervener's argument is that the off-site surveys were good enough, and if they didn't go out and do the on-site. What about the two last points? I mean, what does it mean, the mitigation, which you haven't discussed? The mitigation issue, Your Honor? The mitigation, I think the importance there is, well, first of all, I acknowledge we didn't bring mitigation on appeal. That's not one of the two claims presented. But I think the important thing to recognize there is when you do look at the mitigation framework that's in the record, there's nothing in it about winter habitat or connectivity. And the reason, obviously, is because the agency didn't recognize either of those two And I think the second important point about mitigation is that that framework would have been fundamentally different if BLM had gone out and looked for winter habitat, and if BLM had applied the ODFW strategy as it said it was to identify the connectivity corridor. And if it had done so and discovered either one of those two elements, that would have changed the mitigation strategy, because ODFW in its strategy said that it should have been a no authorization project under those circumstances. The project would either have to be moved or not approved. So I think that's the important takeaway for the issue of mitigation. In terms of the adequacy of the surveys, I would point the Court to your decision a week ago on March 2nd in the Idaho wool growers case, which actually the same panel issued that decision. And you set out the harmless error rule there. And the harmless error rule asks whether the omission materially impeded informed decision making. And in this case, the answer is yes. Because, again, if BLM had found winter habitat or had detected the connectivity corridor, that would have bumped the area up to Category 1 and fundamentally changed the disclosures. We think connectivity aside for now, with regard to the winter habitat, you're making an assumption about what they would have found, i.e. that they would have had the birds up there, and we have no reason to know they would have. That's correct, and I think it comes right back to 1502.22, Your Honor. That regulation sets out that if there's missing information or incomplete. What about the notion that you can just look and see there's a lot of snow up there? Well, that's contrary to all of the evidence in the record, which says that these types of wind-swept ridgetops or escarpments are where the wind sweeps the snow off of the sagebrush. So if you're standing four miles down across the sagebrush sea in a wintry landscape on Steens Mountain, unless you've got the eyes of an eagle, you can't eyeball it from there. That's why Dr. Clay Braun explained in his declaration that site-specific field-based surveys are critical. And not just critical, but industry standard. And Dr. Braun said that he has done these types of surveys at this elevation and higher many times in his career. Well, I'm almost out of time, but I want to... You are out of time. If the court agrees with either of the two claims, we urge you to reverse the district court and vacate the record of decision. Thank you. Thank you very much. Thank you all for your just arguments. Thank you.
judges: Fisher, Berzon, Watford